IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Andrew L.,[1] | ) | C/A No.: 1:20-cv-3319-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Timothy M. Cain, United States District Judge, dated October 20, 2020, referring this matter for disposition. [ECF No. 10]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 8].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.      Relevant Background

        A.      Procedural History

        On April 28, 2018, Plaintiff protectively filed applications for DIB and SSI in which he alleged his disability began on September 20, 2009. Tr. at 248, 250, 423–24, 425–30. His applications were denied initially and upon reconsideration. Tr. at 283–86, 287–90, 293–96, 297–301. On April 24, 2019, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Marcus Christ. Tr. at 79–96 (Hr'g Tr.). The ALJ issued an unfavorable decision on June 4, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 252–75. On July 18, 2019, the Appeals Council granted Plaintiff's request for review, vacated the ALJ's decision, and remanded the case for additional development and a second hearing. Tr. at 276–80. Plaintiff appeared before the ALJ for a second hearing on February 20, 2020. Tr. at 45–78. On April 1, 2020, the ALJ issued a partially-favorable decision, finding Plaintiff became disabled on April 28, 2018.[2] Tr. at 16–44. Thereafter,

---

[2] Plaintiff was found not disabled in an unfavorable decision dated September 7, 2017. *See* Tr. at 133–59. Because that decision was not successfully appealed and Plaintiff did not argue that good cause supported reopening of

2

the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 3–8. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 18, 2020. [ECF No. 1].

### B.    Plaintiff's Background and Medical History

#### 1.    Background

Plaintiff was 53 years old at the time of the most recent hearing. Tr. at 49. He completed high school. *Id.* His past relevant work ("PRW") was as an automobile salesperson and a sales representative. Tr. at 74. He alleges he has been unable to work since September 8, 2017.[3] Tr. at 53.

#### 2.    Medical History[4]

Plaintiff presented to licensed professional counselor Sara L. Cato ("Counselor Cato") for individual psychotherapy on September 1, 2016. Tr. at 575. His diagnoses were indicated as rule out bipolar disorder and severe

---

the prior claim, the court gives res judicata effect to the findings pertaining to the period through the date of the prior decision. Because the ALJ found Plaintiff was disabled as of his SSI filing date, Plaintiff's arguments center on whether he became disabled between September 8, 2017, and September 30, 2017, the date through which he met the insured status requirements of the Social Security Act.

[3] Although Plaintiff originally alleged a disability onset date of September 20, 2009, he moved to amend his alleged onset date to account for the res judicata effect given to the unfavorable decision dated September 7, 2017.

[4] As Plaintiff's arguments center on his mental functioning, the undersigned has summarized records relevant to his mental functioning beginning approximately 12 months prior to his alleged onset date.

alcohol use disorder. *Id.* He admitted he was "really trying to manipulate the system" and "made excuses about why the system owes him this." *Id.* Counselor Cato observed Plaintiff to appear oriented times four; to have no current suicidal or homicidal ideation or thoughts of violence; to demonstrate an anxious and depressed mood; to appear guarded throughout the session; to demonstrate appropriate affect and good eye contact; and to be tangential. *Id.* She confronted Plaintiff about his unhealthy, negative thinking pattern and encouraged him to work on acceptance and taking responsibility. *Id.* She stated Plaintiff seemed to have poor insight into his alcoholism and to play the victim role without taking steps to change his situation. *Id.*

Plaintiff failed to attend individual counseling sessions on September 6 and 13, 2016. Tr. at 577–78.

On September 16, 2016, Plaintiff presented to Preeth A. Menon, M.D. ("Dr. Menon"). Tr. at 684. He reported improved pain and focus and endorsed tiredness. *Id.* Dr. Menon noted euthymic mood. *Id.* He renewed Plaintiff's medications and prescribed Hydroxyzine Pamoate 25 mg and Adderall 10 mg. Tr. at 685.

On October 19, 2016, Plaintiff endorsed mild mood disturbance and anxiety at times, but indicated his mood and pain were better. Tr. at 690. Dr. Menon observed Plaintiff's mood to be dysthymic. *Id.*

On November 17, 2016, Plaintiff reported improved depression, stable attention deficit disorder ("ADD"), and chronic, stable pain. Tr. at 693. Dr. Menon described Plaintiff as having a dysthymic and dysphoric mood. *Id.* He renewed Plaintiff's prescriptions. Tr. at 694.

On December 19, 2016, Dr. Menon noted Plaintiff had chronic depression, anxiety, and ADD. Tr. at 695. He recorded dysthymic, anxious, concerned, and irritable mood and renewed Plaintiff's prescriptions. Tr. at 695–96.

Dr. Menon referred Plaintiff to behavioral health on January 6, 2017, but the order was not performed, as Plaintiff could not afford to pay for treatment. Tr. at 698.

Plaintiff presented to the emergency room ("ER") at Grand Strand Regional Medical Center, after being involved in an altercation on January 7, 2017. Tr. at 668. He admitted to drinking, indicated he might have struck his head on a door, and was uncertain as to whether he lost consciousness. *Id.* John T. Molnar, M.D., assessed nondisplaced fracture of the left small finger proximal phalanx, frontal scalp contusion, and neck strain. Tr. at 673.

On March 22, 2017, Plaintiff requested a work assessment for his disability claim. Tr. at 699. Dr. Menon noted Plaintiff's mood was dysthymic and anxious. *Id.*

Plaintiff failed to attend individual counseling sessions on March 29 and April 10, 2017. Tr. at 576.

Plaintiff returned to Counselor Cato for individual psychotherapy on April 19, 2017. Tr. at 574. He apologized for missing so many appointments, noting he had forgotten the appointments after having scheduled them. *Id.* He said his brain was not working properly. *Id.* He endorsed anger, resentment, and feelings of hopelessness. *Id.* Counselor Cato observed Plaintiff to be oriented times four; to have no current suicidal or homicidal ideation or thoughts of violence; to demonstrate a depressed mood; to be operative; to have inappropriate affect at times with glaring eye contact; to appear disheveled and as if he had lost a lot of weight; and to be very tangential. *Id.* She informed Plaintiff that he would need to transfer to an intern for counseling, given his inability to pay. *Id.* She stated Plaintiff appeared to have poor insight into his actions and to play the victim role without taking any steps to change his situation. *Id.*

Plaintiff denied psychological symptoms on April 26, 2017. Tr. at 703. Dr. Menon recorded euthymic mood. *Id.*

Plaintiff presented to intern Adrienne Lowery ("Ms. Lowery") for individual counseling on May 12, 2017. Tr. at 573. His diagnosis was indicated as moderate, recurrent major depressive disorder ("MDD"). *Id.* Ms. Lowery noted Plaintiff was seeing her instead of another provider because he

could not afford to pay. *Id.* She observed Plaintiff to have normal appearance, dress, motor activity, insight, judgment, mood, memory, and thought flow and content. *Id.* She noted Plaintiff's main goal was to obtain disability benefits because of Lyme disease and other physical problems. *Id.* She indicated Plaintiff had battled with depression because of his living situation and issues with family members. *Id.*

Plaintiff returned to Ms. Lowery for individual counseling on May 19, 2017. Tr. at 572. Ms. Lowery recorded normal findings as to Plaintiff's appearance, dress, motor activity, insight, judgment, mood, memory, and thoughts. *Id.* Plaintiff reported being very upset by his brother's death two days prior. *Id.* Ms. Lowery indicated Plaintiff's depression had worsened due to his brother's death. *Id.*

On May 26, 2017, Ms. Lowery noted Plaintiff had unremarkable motor activity, average insight and judgment, relaxed mood, intact memory, no safety issues, and appropriate appearance, dress, thought content, and flow of thought. Tr. at 571. Plaintiff reported experiencing a Lyme outbreak and being unable to obtain Percocet for pain relief. *Id.* Ms. Lowery noted Plaintiff was planning to go to work following the appointment and observed "no significant difference" during the session. *Id.* Plaintiff was distraught over the loss of his brother and the dysfunctionality of his family. *Id.* He reported he was living with a fellow Alcoholics Anonymous ("AA") member, who was

drinking. *Id.* Ms. Lowery encouraged Plaintiff to relocate to the homeless shelter to remove himself from the situation. *Id.* She noted Plaintiff had maintained his sobriety. *Id.*

Plaintiff endorsed psychological symptoms on May 31, 2017. Tr. at 707. Dr. Menon noted dysthymic, frustrated, and anxious mood. *Id.* He renewed Plaintiff's prescriptions. Tr. at 708.

Plaintiff returned to Ms. Lowery for individual counseling on June 2, 2017. Tr. at 570. Ms. Lowery observed Plaintiff to have an appropriate appearance and dress, unremarkable motor activity, average insight and judgment, relaxed mood, intact memory, appropriate thought content and flow of thought, and no safety issues. *Id.* Plaintiff primarily focused on his upcoming disability hearing during the session and asked that Ms. Lowery report he was incapable of working. *Id.* Ms. Lowery indicated she would be honest and do what she could to help. *Id.* She noted Plaintiff had maintained sobriety. *Id.*

On June 5, 2017, Plaintiff telephoned Dr. Menon's office to question whether he had completed a disability form and whether it could be picked up the following day. Tr. at 709. Dr. Menon's nurse informed Plaintiff that the form had not been completed. *Id.* Plaintiff grew angry and said he was coming to the office the following day. *Id.*

On October 5, 2017, Plaintiff was concerned that Strattera had caused him to be very angry and have high anxiety. Tr. at 716. He said he had recently been arrested after "flipping out." *Id.* He also indicated he had been thrown out of New Directions Men's Shelter for drinking. *Id.* Tina M. Doud-Kearns, FNP ("NP Doud-Kearns"), noted Plaintiff had pressured speech, rambling thoughts, poor focus, and was unable to repeat what she told him regarding medications, counseling, lab studies, and follow up. Tr. at 717. She assessed ADD/anxiety versus possible bipolar disorder, discontinued Strattera, and prescribed Elavil. *Id.*

On October 17, 2017, Plaintiff reported feeling depressed and endorsed persistent worry, initial insomnia, decreased need for sleep, racing thoughts, and thinking two thoughts at the same time. Tr. at 722. He indicated he experienced racing thoughts and mood swings from hopefulness to hopelessness. Tr. at 723. He said his racing thoughts would prevent him from sleeping for two to three nights and he would sometimes sleep for two days. *Id.* He reported having blacked out, been charged with trespassing, and ended up in jail after having been denied disability benefits. *Id.* Licensed independent social worker Tricia M. Linde ("SW Linde") noted Plaintiff had euthymic mood, racing thoughts, and his behavior demonstrated impulsivity. Tr. at 722. She assessed bipolar I disorder and recommended cognitive behavioral therapy ("CBT"). *Id.*

On December 21, 2017, Plaintiff admitted to frequently self-adjusting his psychiatric medications. Tr. at 740. NP Doud-Kearns noted Plaintiff had flight of ideas and changed the topic when she attempted to discuss her concerns with his self-adjustment of medications. Tr. at 741.

Plaintiff complained of worsening memory on May 14, 2018. Tr. at 758. NP Doud-Kearns noted Plaintiff had flat affect, interrupted her and her nurse when they were attempting to respond, and appeared worried and anxious in conversation. Tr. at 759. She noted Plaintiff's level of cognitive functioning was impaired. *Id.* She planned for Plaintiff to meet with a counselor and undergo a mini-mental state exam ("MMSE"). Tr. at 760.

On May 24, 2018, NP Doud-Kearns indicated a need to replace Elavil, as it had helped with Plaintiff's sleep and mood. Tr. at 834. She prescribed Zyprexa 5 mg for sleep and mood and instructed Plaintiff to keep his counseling appointment. Tr. at 838.

On July 13, 2018, Plaintiff presented to Cashton B. Spivey, Ph.D. ("Dr. Spivey"), for a consultative psychological evaluation. Tr. at 779–81. He endorsed memory deficits, fatigue, and joint pain. Tr. at 779. He indicated he had been employed by a temporary agency for 10 to 15 hours per week since March 2018, serving as a banquet server and trash collector at a baseball field. *Id.* He reported he was getting along well with others in the workplace. *Id.* He complained of dysphoria, erratic sleep pattern, low energy,

10

attention/concentration problems, generalized anxiety, and ruminations. Tr. at 780. He endorsed satisfactory appetite and denied crying spells, suicidal and homicidal ideation, paranoid ideation, and auditory and visual hallucinations. *Id.* He admitted to a history of alcohol dependence and arrests. *Id.* He denied current alcohol use, indicating his last use was approximately one year prior. *Id.* He said he was able to bathe and dress independently, use a microwave oven, make his bed, clean mirrors, attend church, watch television, read a newspaper, and manage his own finances. *Id.* He felt that he would have difficulty with simple arithmetic and said he had no close friends. *Id.*

Dr. Spivey observed Plaintiff to be appropriately dressed and groomed and to be cooperative and compliant throughout the evaluation. *Id.* He noted Plaintiff obtained a total score of 21 of 30 on the MMSE, which suggested cognitive difficulties. *Id.* He stated Plaintiff was oriented to time, place, and person, but did not know the date, day of the week, or county. *Id.* He indicated Plaintiff was unable to perform serial sevens or spell the word "world" backwards. *Id.* He noted Plaintiff was unable to recall any of three objects after a five-minute delay, suggesting impaired short-term auditory memory. *Id.* He said Plaintiff followed two steps in a three-step command. Tr. at 781. He reported Plaintiff accurately reproduced a drawing, demonstrated a satisfactory general fund of information, had fair abstract reasoning ability,

fair insight and judgment, and low-average to borderline general intelligence. *Id.* He described Plaintiff's mood as mildly sad and his affect as blunted. *Id.* He said Plaintiff had logical and coherent thought processes with no evidence of overt psychosis. *Id.* He described Plaintiff's attention as fair and his concentration as fair to poor. *Id.* He noted Plaintiff had normal speech and psychomotor functioning, appropriate eye contact, and mildly reduced energy level. *Id.* He indicated diagnoses of bipolar disorder, depressed phase by history; possible neurocognitive disorder due to Lyme's disease; unspecified anxiety disorder; and alcohol use disorder in sustained remission. *Id.* He wrote the following:

> [Plaintiff] is an individual who would display difficulty managing funds independently and accurately. This assessment is based primarily on his inability to perform serial 7's suggesting deficits in his calculation abilities as well as an estimate of his general intelligence score likely falling in the low average to borderline range . . . . He would be capable of understanding simple instructions and performing simple tasks in the workplace. He would display difficulty understanding complex instructions and performing complex tasks in the workplace. This assessment is based primarily on an estimate of his general intelligence score likely fall[ing] in the low average to borderline range. He would display difficulty relating well to others in the workplace due to his report of bipolar related mood swings. However, he stated that he is currently getting along well with others while working through the temporary agency. [Plaintiff] believes he would have problems with stamina, persistence in the workplace due to his report of a significantly low energy level, and attention/concentration problems. During this evaluation, he did appear to display a mild reduction in his energy level and his attention was fair while his concentration range[d] from fair to poor.

*Id.*

On July 25, 2018, state agency psychological consultant Blythe Farish-Ferrer, Ph.D. ("Dr. Farish-Ferrer"), reviewed the record and completed psychiatric review techniques for the current period and Plaintiff's date last insured ("DLI") for DIB of September 30, 2017. Tr. at 166–69. For the current period, she considered Listings 12.02 for neurocognitive disorders; 12.04 for depressive, bipolar, and related disorders; and 12.06 for anxiety and obsessive-compulsive disorders. Tr. at 166. She assessed Plaintiff as having moderate limitations in his abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. *Id.* She wrote: "While it is concluded that clmt's mental impairments are severe, these impairments are not expected to preclude the performance of simple, repetitive work tasks in a setting that does not require on-going interaction with the public." Tr. at 167. For Plaintiff's DLI, Dr. Farish-Ferrer considered Listings 12.04 and 12.06 and assessed Plaintiff as having no difficulties in his ability to adapt or manage oneself; mild difficulties in his ability to understand, remember, or apply information; and moderate difficulties in his abilities to interact with others and to concentrate, persist, or maintain pace. Tr. at 168.

Dr. Farish-Ferrer also completed mental functional capacity assessments for the current period and the period prior to Plaintiff's DLI. *See*

Tr. at 172–76. For the current period, Dr. Farish-Ferrer indicated Plaintiff was moderately limited as to the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to interact appropriately with the general public; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. Tr. at 172–75. On Plaintiff's DLI, Dr. Farish-Ferrer considered him to have moderate limitations in many of the same functions, except that his abilities to understand and remember detailed instructions and respond appropriately to changes in the work setting were not impaired. Tr. at 175–76. She indicated Plaintiff was "capable of performing simple tasks for at least two hour periods of time but not for complex tasks," "expected to occasionally miss a day of work secondary to his psychiatric symptoms," "expected to have difficulty working in close proximity or coordination with co-workers," "best suited for a job which does not require continuous interaction with the general public," "capable of single, repetitive tasks without special supervision," and able to "attend work regularly and accept supervisory feedback." Tr. at 176.

Plaintiff complained of no energy and widespread pain on August 1, 2018. Jodie Webb, FNP ("NP Webb"), noted she was unable to determine which medications Plaintiff was taking, as he did not bring his medications, stated he had not received all of his medications from WellVista, and was bringing up medications he was prescribed in the past. Tr. at 841. Plaintiff endorsed feeling tired or poorly, high irritability, and depression. Tr. at 842. NP Webb instructed Plaintiff to follow up with his primary care physician in one week. Tr. at 843.

On August 2, 2018, Plaintiff presented to Stephen Smith, M.D. ("Dr. Smith"), for a consultative medical exam. Tr. at 785. He reported a 25-year history of bipolar disorder, a history of attention deficit hyperactivity disorder ("ADHD") since childhood, and a 20-year history of depression, and indicated he took medications for these impairments. Tr. at 785–86. Dr. Smith observed Plaintiff to have normal mentation, fair personal hygiene, and ability to follow simple directions. Tr. at 787. He stated the exam was somewhat difficult, as he believed Plaintiff put forth less than good effort. *Id.* He found no evidence of functional limitation related to bipolar disorder, ADHD, or depression. *Id.*

Plaintiff followed up with NP Doud-Kearns on August 14, 2018. Tr. at 844. He complained of fatigue and widespread pain. *Id.* He stated he could not remember things and felt as if his memory problems might be related to

his pain and ADD. *Id.* He indicated a desire to restart Cymbalta. *Id.* He also endorsed emotional lability and depression. *Id.* NP Doud-Kearns noted Plaintiff spoke of many topics of concern such that she had difficulty keeping him focused on one problem before he would move to the next. Tr. at 845. She prescribed Cymbalta 60 mg and instructed Plaintiff to follow up with his counselor. Tr. at 846.

On October 22, 2018, Plaintiff complained of pain throughout his body that was most acute in his left shoulder and the left side of his neck. Tr. at 858. He requested to be placed on Adderall. *Id.* He endorsed anxiety and depression. Tr. at 859. He indicated he had extreme difficulty doing work, taking care of things at home, or getting along with other people. Tr. at 861. William O'Connor, M.D. ("Dr. O'Connor"), assessed unstable mood disorder and noted he would be unable to assess Plaintiff for other conditions until his mood stabilized. Tr. at 862. He cited high scores on a mood disorder questionnaire and other screening tools consistent with ADHD, moderate-to-severe anxiety, and severe depression. *Id.* He referred Plaintiff to behavioral health for clarification of diagnosis, discontinued Zyprex as ineffective, and prescribed Seroquel 50 mg at bedtime. *Id.*

SW Linde provided a statement on October 26, 2018, indicating she had served as Plaintiff's counselor since October 2017. Tr. at 870. She stated Plaintiff's diagnoses included ADD and bipolar disorder, expressed as

alternation between depression and increased irritability. *Id.* She indicated Plaintiff reported a history of alcohol dependence, but had not relapsed over the prior 12-month period. *Id.* She noted Plaintiff was not presently involved with AA, but had been involved with the organization over the prior 25 years. *Id.* She stated Plaintiff often complained of memory problems he suspected might be related to Lyme disease, but had been unable to pursue specific workup because he lacked insurance. *Id.* She indicated she was working with Plaintiff to address irrational thoughts and beliefs and depressed and anxious mood through CBT. *Id.* She noted Plaintiff had made some progress, but had been hindered by stress related to homelessness. *Id.*

On October 31, 2018, a second state agency psychological consultant, Michael Neboschick, Ph.D. ("Dr. Neboschick"), reviewed the record, completed psychiatric techniques for the current period and the period prior to Plaintiff's DLI, and assessed the same degree of limitation as Dr. Farish-Ferrer for both periods. *Compare* Tr. at 166–69, *with* Tr. at 208–11. He also assessed the same mental RFCs for the current period and Plaintiff's DLI. *Compare* Tr. at 172–76, *with* Tr. at 216–20.

On November 12, 2018, Dr. O'Connor noted Plaintiff had informed the behavioral health counselor that he felt sedated on Seroquel. Tr. at 875. He indicated the behavioral health counselor had agreed with the diagnosis of bipolar disorder. Tr. at 878. He recommended decreasing Amitriptyline to

reduce sedation and prescribed Depakote 50 mg twice a day for two weeks and then three times a day. *Id.*

Plaintiff followed up with Dr. O'Connor for bipolar disorder on December 20, 2018. Tr. at 887. He indicated he had not started Depakote until ten days prior to the visit, but had noticed more stable mood and improved attention since starting it. *Id.* Dr. O'Connor increased Depakote to 500 mg a day and instructed Plaintiff to have his level checked in three weeks and to follow up in four weeks. Tr. at 889.

On January 3, 2019, Dr. O'Connor noted Plaintiff was euthymic on his current medication. Tr. at 927. He planned to wean Plaintiff off Seroquel if his symptoms remained stable on Cymbalta and Depakote. *Id.*

Plaintiff reported he had been unable to obtain Depakote on January 18, 2019. Tr. at 931. Dr. O'Connor ordered Plaintiff to restart two Depakote 280 mg tablets, twice daily. Tr. at 934.

On January 30, 2019, Plaintiff presented to Waccamaw Mental Health Center for an initial clinical assessment. Tr. at 911. He reported a history of bipolar disorder, ADD, and alcohol abuse. *Id.* He endorsed lack of interest in things once enjoyed, suicidal ideation, racing thoughts, paranoia, mood swings, insomnia, having gone days without sleep, seeing shadows, and hearing voices. *Id.* Irene P. Knowlin ("Ms. Knowlin") noted Plaintiff presented as vague regarding his current alcohol use, and she felt that he likely

continued to use alcohol. *Id.* She observed Plaintiff to have a guarded attitude, constricted affect, depressed mood, and circumstantial thought process, but indicated he had normal appearance, hygiene, motor activity, eye contact, and speech. Tr. at 915. She indicated Plaintiff had alert sensorium, intact recent and remote memory, mildly impaired attention and immediate recall, average language, poor judgment, limited insight, average fund of knowledge, and was easily distracted in concentration and calculations. Tr. at 916. Ms. Knowlin assessed unspecified bipolar and related disorder and moderate alcohol use disorder. *Id.* She recommended CBT and indicated Plaintiff needed to be referred to an alcohol and drug program for assessment. Tr. at 916–17.

Plaintiff complained of feeling a little more depressed on February 25, 2019. Tr. at 940. Dr. O'Connor assessed unstable bipolar disorder with depression, continued Cymbalta, changed Depakote to an extended release version, and encouraged Plaintiff to attend his appointment with the psychiatrist. Tr. at 943.

SW Linde provided a second letter on March 15, 2019, that was identical to her October 2018 letter. *Compare* Tr. at 870, *with* Tr. at 902.

On March 21, 2019, Plaintiff followed up with Dr. O'Connor to discuss adverse effects of Depakote and to request a referral to a psychiatrist. Tr. at 904. He endorsed sadness, sleeping more than usual, eating more than usual,

poor concentration, and sometimes feeling unmotivated to shower. *Id.* Dr. O'Connor indicated Plaintiff's lack of motivation was more likely caused by severe depression than side effects of Depakote. Tr. at 907. He felt psychiatric intervention was required. *Id.*

Plaintiff presented to Jason Gnau ("Mr. Gnau") for a non-physician mental health assessment on March 26, 2019. Tr. at 959. He denied suicidal ideation and endorsed racing thoughts and sleep disturbance. *Id.* Mr. Gnau observed Plaintiff to be alert and oriented times four, to have normal cognitive functioning, and to have underlying depressed mood. *Id.*

On April 9, 2019, Plaintiff endorsed intermittent depression over most of his life with severe decreased enjoyment of activities over the prior 15 years, poor sleep, poor energy, poor concentration, increased appetite with weight gain of 30 pounds over the prior four months while taking Seroquel, severe generalized anxiety, two panic attacks per month, avoidance of activities, and intermittent suicidal ideation. Tr. at 957. He denied a history of mania, hallucinations, paranoia, and homicidal ideation. *Id.* William Van Horn, M.D. ("Dr. Van Horn"), recorded normal findings on mental status exam ("MSE"), aside from anxious mood and fair judgment and insight. Tr. at 958. He diagnosed major MDD, panic disorder, and posttraumatic stress disorder ("PTSD"). *Id.* He discontinued Cymbalta, started Effexor, and continued Elavil, Seroquel, Gabapentin, and Depakote. *Id.*

Plaintiff also followed up with Mr. Gnau for individual counseling on April 9, 2019. Tr. at 960. He reported flat mood and feeling frustrated. *Id.* He indicated his mood could swing like a pendulum and he had lost interest in things he normally enjoyed. *Id.* He complained of memory problems. *Id.* Mr. Gnau indicated he was building rapport with Plaintiff. *Id.*

Dana Lidard ("Ms. Lidard"), Plaintiff's case manager at New Directions Men's Shelter, provided a letter on his behalf dated April 9, 2019. Tr. at 954. She stated Plaintiff had lived in the shelter since July 14, 2017. *Id.* She noted Plaintiff had struggled with various issues and had informed her he was experiencing depression, impaired memory, problems with stamina, and insomnia. *Id.* She indicated Plaintiff underwent regular testing and had remained drug- and alcohol-free. *Id.*

On April 23, 2019, Plaintiff reported severe depression, poor sleep, poor energy, fair concentration, good appetite, severe generalized anxiety, and two panic attacks over the prior two-week period. Tr. at 970. He endorsed intermittent suicidal ideation without a plan and denied avoidance of activities, paranoia, hallucinations, and homicidal ideation. *Id.* Dr. Van Horn recorded normal findings on MSE, aside from depressed and anxious mood, flat affect, mild concentration impairment, and fair insight and judgment. *Id.*

On May 23, 2019, Plaintiff reported feeling better with no significant depression, good sleep, fair energy, poor concentration, good appetite, mild

generalized anxiety, no panic attacks, no avoidance of activities, no hallucinations, no paranoia, no manic symptoms, and no suicidal or homicidal ideation. Tr. at 972. Dr. Van Horn noted fair judgment and insight and otherwise normal findings on MSE. *Id.* He indicated Plaintiff was to discontinue Depakote and slowly titrate Neurontin to 1200 mg three times a day. Tr. at 973.

Plaintiff reported having run out of Depakote on August 6, 2019. Tr. at 984. Dr. O'Connor assessed unstable bipolar disorder with severe depression. Tr. at 986. He indicated he would check Plaintiff's lab studies in about four weeks, after he had resumed use of Depakote for a few weeks, and follow up thereafter. *Id.* He instructed Plaintiff to continue to follow up with his psychiatrist. *Id.*

Plaintiff presented to Violetta Czepowicz, M.D. ("Dr. Czepowicz"), on September 18, 2019. Tr. at 974. He reported the prior two months had been "rough," as he injured himself when he fell off a moped. *Id.* He endorsed passive suicidal ideation, good appetite, okay sleep, and decreased energy, interest, and concentration. *Id.* Dr. Czepowicz noted normal findings on MSE, aside from suicidal ideation without plan, depressed mood, and fair insight and judgment. *Id.* She assessed bipolar disorder with psychotic features, MDD, panic disorder, and PTSD. *Id.* She continued Plaintiff's medications. Tr. at 976.

Mr. Gnau wrote a letter on Plaintiff's behalf dated February 7, 2020. Tr. at 1033–34. He stated Plaintiff had been a patient at Waccamaw Mental Health Center since January 30, 2019, and saw him once or twice a month for individual counseling. Tr. at 1033. He identified Plaintiff's diagnoses as severe bipolar disorder with psychotic features, MDD, panic disorder, and PTSD. Tr. at 1033–34. He explained Plaintiff's severe depression caused him to feel fatigued on a regular basis. Tr. at 1034. He noted Plaintiff reported racing thoughts daily that strongly affected his abilities to focus, concentrate, and follow through with tasks. *Id.* He indicated Plaintiff had difficulty properly interacting with the general public and with stressful situations when he presented in a manic mood. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

i.    April 24, 2019

During the first hearing, Plaintiff testified he was living at New Directions Men's Shelter, where he had lived since July 2017. Tr. at 84. He stated he had last worked part-time for First Baptist Church of Myrtle Beach. *Id.* He said he had previously worked as a sales representative for home improvement companies and an auto salesman. Tr. at 84–85.

23

Plaintiff testified that he began feeling ill all the time in 2008 or 2009. Tr. at 85. He said it took nearly a year for his providers to confirm that he had contracted Lyme disease. *Id.* He stated he had aching and pain all over, flu-like symptoms, fatigue, and impaired memory. *Id.* He said his doctors had treated him with different medications and had referred him to a pain specialist. Tr. at 86–87. He indicated his doctor had recommended he apply for disability benefits in 2012. Tr. at 87. He stated he visited Little River Medical nearly every month. *Id.* He said he was compliant with his providers' treatment recommendations. Tr. at 88. He confirmed that his symptoms improved somewhat with medication. *Id.* He said his pain was sometimes so bad that he would hold his breath. *Id.*

Plaintiff testified his condition had progressively worsened since he was denied benefits two years prior. *Id.* He said he could hardly do anything he used to be able to do. *Id.* He indicated he was seeing a doctor for psychiatric problems. Tr. at 89. He admitted he had lived with his father prior to moving into the homeless shelter, but said his father could no longer care for him. *Id.*

Plaintiff denied drinking alcohol, but admitted he had "tested the waters maybe once or twice over the . . last four years." Tr. at 90. He said alcohol made his condition worse. *Id.* He indicated he was seeing a psychiatrist and participating in counseling. Tr. at 91. He stated his

psychiatrist had wanted to hospitalize him during an appointment the prior day. *Id.* He said his doctor indicated he was not safe at the time. Tr. at 92.

ii.    February 20, 2020

At the second hearing, Plaintiff testified he was 5'9" tall, weighed 220 pounds, and was right-handed. Tr. at 49. He said he was divorced, had two adult children, and lived alone. *Id.* He stated he last worked for a church as a part-time handyman for eight weeks in the spring of 2019. Tr. at 49–50. He noted he had previously worked in auto sales for a month-and-a-half to two months. Tr. at 50.

Plaintiff testified he was unable to work because he frequently experienced flu-like symptoms. Tr. at 53. He stated he sometimes experienced the symptoms five times a month and sometimes went a month without them. *Id.* He said his doctors had explained the symptoms were related to Lyme disease. *Id.* He indicated he experienced body aches and could not do anything while experiencing the symptoms. *Id.* He said he had received antibiotic treatment, but his late-term Lyme disease could not be cured. Tr. at 54. He noted the condition sometimes caused him to be "down" for a week or two at a time. *Id.*

Plaintiff stated he spent a little time volunteering at the shelter where he previously lived. *Id.* He said the beach was his favorite place, but he had not been there during the prior year. *Id.* He indicated people helped him with

25

his groceries and his rent was covered through a government program. *Id.* He said he had lived in the shelter for two years prior to moving into his current home. *Id.* He explained that his church had assisted him in furnishing his home, his friend had paid his water and electric bills, and his brother and children had sent him money to cover expenses. Tr. at 55. He admitted he had bought a pack of cigarettes "here and there," but claimed he could not afford them and had "almost completely given them up." *Id.* He said he was last arrested approximately two years prior, following a confrontation with the night manager at the shelter. Tr. at 56. He denied having told the intake worker at Waccamaw Mental Health Center that he was there for medication only and did not want to participate in counseling. *Id.* He said he had been participating in counseling on a regular basis. Tr. at 57. He indicated he took his medication as prescribed and had only been non-compliant with medication recommendations when the service that supplied his medication had failed to fill it on time. Tr. at 58. However, he subsequently noted he had stopped medication he thought was negatively impacting his ability to urinate. *Id.* He said he could not take ibuprofen. *Id.*

Plaintiff stated he felt he was unable to work any full-time job, including a seated one. Tr. at 59. He said he was scared to accept a part-time job because he felt he would not be able to show up for work because of illness. *Id.* He admitted he had worked as a banquet server for a staffing

company, but could not keep up with the job and was not asked to continue working. *Id.* He acknowledged that he had made over $50,000 a year during some years, but said his earnings significantly decreased after he contracted Lyme disease. Tr. at 59–60. He said he had subsequently worked odd jobs and had attempted to work many times. Tr. at 61. He indicated he had been fired from multiple jobs since developing Lyme disease, but had never been fired from a job prior to becoming ill. Tr. at 62.

Plaintiff testified on some days he did not move at all. *Id.* He indicated on other days, he might get up, clean the house, and volunteer at the shelter kitchen. *Id.* He said his friend would pick him up for his volunteer job and some days he would have to take him home early because he could not handle sitting and would only work for a half hour. *Id.* He confirmed his level of functioning had remained fairly consistent over the prior two years. Tr. at 63. However, he noted he felt scared because he was starting to forget a lot. *Id.*

Plaintiff confirmed he felt tired all the time and his joints and muscles were sore. Tr. at 65–66. He said he was also receiving treatment for depression. Tr. at 66.

Plaintiff testified he had previously worked for a home improvement company, selling windows and sunrooms. Tr. at 73–74. He indicated he had worked in auto sales for a Nissan dealership. Tr. at 74. He said he had worked in car sales for one dealership for nearly 20 years. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") Deauna Froneberger reviewed the record and testified at the hearing on February 20, 2020. Tr. at 73–77. The VE categorized Plaintiff's PRW as an automobile salesperson, *Dictionary of Occupational Titles* ("*DOT*") No. 273.353-010, as requiring light exertion with a specific vocational preparation ("SVP") of 6, and a sales representative, *DOT* No. 279.357-014, as requiring light exertion with an SVP of 5. Tr. at 74. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work requiring no climbing of ladders or scaffolds; frequent climbing of ramps or stairs; frequent stooping; occasional crouching, kneeling, and crawling; frequent overhead reaching; avoiding all exposure to unprotected heights; limited to simple, routine, repetitive tasks in a work environment free of fast-paced production requirements; involving only simple work-related decisions with few, if any, workplace changes; occasional interaction with the public and coworkers; and no tandem tasks. Tr. at 74–75. The VE testified the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 75. The ALJ asked whether there were any other jobs in the economy the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of 2 as a marker, *DOT* No. 209.587-034, a router, *DOT* No. 222.587-038, and a photocopying machine operator, *DOT* No. 207.685-014, with approximately 50,000, 50,000, and 15,000 positions in the national

economy, respectively. *Id.* He asked if Plaintiff had any transferable skills to the sedentary exertional level. *Id.* The VE said he did not. *Id.* The ALJ asked if there would be any jobs if the hypothetical individual would be off-task for more than an hour a day, in addition to normal breaks. *Id.* The VE testified there would be no jobs. *Id.* The ALJ asked if there would be any jobs if the individual were to miss more than two days of work per month on a regular basis. *Id.* The VE stated there would be no jobs. Tr. at 76.

Plaintiff's counsel asked the VE if she was familiar with the Social Security Administration's ("SSA's") term of remaining occupational basis, as it related to erosion of the occupational base. *Id.* The VE confirmed she was. *Id.* Plaintiff's counsel asked the VE if she was familiar with the SSA's policies and procedures regarding how to assess for the remaining occupational base when the additional limitations were so significant as to erode the remaining jobs. *Id.* The VE stated she was familiar with the term, but not with the way counsel was stating it. *Id.* Plaintiff's counsel asked the VE if the light occupational base would be significantly eroded by the additional restrictions the ALJ included in his first hypothetical question. Tr. at 77. The VE stated it would. *Id.*

### c.    Witness Testimony

Michael Janczak ("Mr. Janczak") testified at the second hearing. Tr. at 66–72. He explained he had worked for nearly 40 years as a human resources

director for several regional and international corporations prior to retiring eight years earlier, moving to the area, and serving as a part-time staff member at New Directions of Horry County. Tr. at 67. He stated New Directions was a non-profit organization that operated the area homeless shelters. *Id.* He said he oversaw kitchen operations in the organization's four shelters. *Id.*

Mr. Janczak explained he met Plaintiff when he was a client at the men's shelter. *Id.* He stated Plaintiff was no longer a client, as he presently lived alone in an apartment. *Id.* He said he took Plaintiff under his wing and tried to help him out. Tr. at 68. He confirmed he had seen Plaintiff at least weekly over the prior two to three years. *Id.*

Mr. Janczak testified the other volunteers had problems with Plaintiff, as he was very opinionated. *Id.* He indicated other volunteers had requested they not be scheduled to work with Plaintiff. *Id.* He said he explained to Plaintiff and the other volunteers they would be required to work with whomever he had scheduled. *Id.* He noted he did not have a problem with Plaintiff, as he got along with everybody, but others were irritated by him. Tr. at 69. He confirmed Plaintiff volunteered in the shelter kitchen on a very limited basis. *Id.* He stated Plaintiff could not sustain work for more than a couple hours, as he often felt sick and tired easily. *Id.* He said he continued to ask Plaintiff to volunteer because he knew he needed to get out of the house

and interact with other people. *Id.* He admitted Plaintiff was sometimes unavailable to assist for several days at a time because of his health problems. *Id.*

Mr. Janczak testified he would not hire Plaintiff for a paid position. Tr. at 70. He said he could not in good conscience place Plaintiff in a position with the knowledge that he had limited ability to sustain the work. *Id.* He confirmed Plaintiff's state had remained the same since September 2017. Tr. at 70–71. He said Plaintiff had served as a volunteer for 12 to 14 months. Tr. at 71. He stated Plaintiff was a good person who needed help. Tr. at 72.

2.    The ALJ's Findings

In his decision dated April 1, 2020, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2017.
2.    The claimant has not engaged in substantial gainful activity since the alleged onset date. (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    Since the alleged onset date of disability, September 8, 2017, the claimant has had the following severe impairments: Lyme disease, posttraumatic stress disorder (PTSD), degenerative disc disease, attention-deficit/hyperactivity disorder (ADHD), and bipolar disorder (20 CFR 404.1520(c) and 416.920(c)).
4.    Since September 8, 2017, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, the undersigned finds that prior to April 28, 2018, the date the claimant became disabled, the claimant had the residual functional capacity to

31

perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he could never climb ladders, ropes, or scaffolds and could frequently climb ramps and stairs. He could frequently stoop and occasionally crouch, kneel, and crawl. He could frequently reach overhead. He must avoid all exposure to unprotected heights. He was limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements and involving only simple, work-related decisions with few, if any, workplace changes. He could tolerate occasional interaction with the public and coworkers, but should not perform tandem tasks.

6. After careful consideration of the entire record, the undersigned finds that beginning on April 28, 2018, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can never climb ladders, ropes, or scaffolds and can frequently climb ramps and stairs. He can frequently stoop and occasionally kneel, crouch, and crawl. He can frequently reach overhead. He must avoid all exposure to unprotected heights. He is limited simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements and involving only simple, work-related decisions with few, if any, workplace changes. He can tolerate occasional interaction with the public and coworkers, but should not perform tandem tasks. He would be off task for more than one hour during an eight-hour workday in addition to regular breaks.

7. Since September 8, 2017, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8. Prior to the established disability onset date, the claimant was an individual closely approaching advanced age. The claimant's age category has not changed since the established disability onset date (20 CFR 404.1563 and 416.963).

9. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Prior to April 28, 2018, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills. Beginning on April 28, 2018, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Prior to April 28, 2018, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969(a)).

12. Beginning on April 28, 2018, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

13. The claimant was not disabled prior to April 28, 2018, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

14. The claimant was not under a disability within the meaning of the Social Security Act at any time through September 30, 2017, the date last insured (20 CFR 404.315(a) and 404.320(b)).

15. The claimant's substance use disorder is not a contributing factor material to the determination of disability (20 CFR 404.1535 and 416.935).

Tr. at 23–37.

II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)   the ALJ did not adequately explain the RFC assessment as required pursuant to SSR 96-8p; and

2)   the ALJ failed to properly evaluate Dr. Spivey's opinion.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4)

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20

whether such impairment prevents claimant from performing PRW;[6] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982).

---

C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[6] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*,

*Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    RFC Assessment

Plaintiff argues the ALJ failed to explain his RFC assessment, as required by SSR 96-8p. [ECF No. 20 at 23–31].

The Commissioner argues the ALJ considered Plaintiff's testimony, the medical evidence, and the prior ALJ decision in logically concluding that he could perform a range of light work during the period prior to April 2018. [ECF No. 22 at 8]. He maintains the ALJ explained that Plaintiff's symptoms were well-controlled with medication and his treatment records showed few significant abnormalities through October 2017 and little evidence appeared in the record again until May 2018. *Id.* at 8–9. He contends the ALJ considered the prior ALJ's decision, Mr. Janczak's testimony, Plaintiff's reports to the consultative examiner, behavior during the consultative exams, and the state agency psychologists' opinions in assessing the RFC. *Id.* at 9–11.

A claimant's RFC represents "the most [he] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). To determine a claimant's RFC, the ALJ is to "consider all of the claimant's 'physical and mental limitations, severe and otherwise, and determine on a function-by-function basis, how they affect [his] ability to work.'" *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin*, 826 F.3d 176,

188 (4th Cir. 2016)). The RFC assessment should reflect the ALJ's consideration of all the relevant evidence, and he should account for all the claimant's medically-determinable impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ must include a narrative discussion citing "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)" and explaining how all the relevant evidence supports each conclusion. SSR 96-8p, 1996 WL 374184, at *7. He "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* "Remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

ALJs are required to use the special technique in 20 C.F.R. § 404.1520a and § 416.920a in evaluating all cases involving mental impairments. If the ALJ concludes that the claimant has a severe mental impairment, he must rate the degree of the claimant's functional limitation as none, mild, moderate, marked, or extreme based on "the extent to which [his] impairment(s) interfere with [his] ability to function independently, appropriately, effectively, and on a sustained basis" in the broad functional

areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself." 20 C.F.R. §§ 404.1520a(b), (c)(2), (3), (4), 416.920a(b), (c)(2), (3), (4). If, after rating the degree of functional limitation resulting from the claimant's mental impairment, the ALJ determines it does not meet or is not equivalent in severity to a listed mental disorder, he is to consider the impairment in assessing the claimant's RFC. 20 C.F.R. §§ 404.1520a(d), 416.920a(d).

The court has considered Plaintiff's specific allegations of error, given this authority.

a.    Concentrating, Persisting, or Maintaining Pace

Plaintiff maintains the ALJ failed to account for his marked difficulties in concentrating, persisting, or maintaining pace for the period prior to April 28, 2018. [ECF No. 20 at 25]. He claims the restrictions in the RFC assessment do not adequately account for evidence the ALJ acknowledged as to his significant problems maintaining focus, remembering simple instructions, and maintaining stamina during physical activity. *Id.* at 25–28.

The Commissioner contends the records and evidence of increasing pain and difficulty focusing since May 2018 supported further limitation beginning April 28, 2018. [ECF No. 22 at 11]. He maintains the ALJ adequately addressed Plaintiff's impaired concentration, persistence, or pace

through the restriction to a work environment free of fast-paced production requirements. *Id.* at 12.

The ALJ assessed Plaintiff as having "a marked limitation" in concentrating, persisting, or maintaining pace" before the established onset date. *Id.* A marked limitation means the claimant has seriously limited ability to function independently, appropriately, effectively, and on a sustained basis in concentrating, persisting, or maintaining pace. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(F)(2)(c).

Evaluation of a claimant's ability to concentrate, persist, or maintain pace requires consideration of his "abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(E)(3). "[T]he nature of this area of mental functioning" addresses the following non-exclusive functions:

> initiating and performing a task that you know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.

*Id.* Although these examples "illustrate the nature of this area of mental functioning," the ALJ is not required to document his consideration of all the examples. *Id.*

The Fourth Circuit has "agree[d] with other circuits that an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." *Mascio*, 780 F.3d at 638. In *Mascio*, the court considered remand appropriate based on the record before it "because the ALJ here gave no explanation." *Id.* However, the court recognized that a restriction to simple, routine tasks or unskilled work could account for significant restrictions to concentration, persistence, or pace if the ALJ provided an appropriate explanation. *See id.*; *see also Sipple v. Colvin*, C/A No. 8:15-1961-MBS-JDA, 2016 WL 4414841, at *9 (D.S.C. July 29, 2016), adopted by 2016 WL 4379555 (D.S.C. Aug. 17, 2016) ("After *Mascio*, further explanation and/or consideration is necessary regarding how Plaintiff's moderate limitation in concentration, persistence, or pace does or does not translate into a limitation in his RFC.").

Although the ALJ cited evidence suggesting Plaintiff had significant problems maintaining focus, remembering instructions, and maintaining stamina, he also noted evidence that would suggest his impairment would not preclude all work activity. He acknowledged Plaintiff reported problems with concentration, paying attention, and completing tasks and "treatment records show[ed] ongoing complaints of problems with attention and concentration, though some improvement was reported with medication." *Id.* He recognized

42

that Plaintiff's concentration was rated as ranging "from fair to poor" during the consultative exam, writing: "During that examination, the claimant was unable to perform serial sevens or spell "world" backwards, but was able to follow two of three steps in a three-step command." *Id.* He noted Plaintiff's concentration had been assessed as intact or only mildly impaired during other exams and he had reported being able to "perform personal care, prepare simple meals, complete household chores, drive a moped, shop, and pay bills." *Id.*

Pertinent to Plaintiff's arguments as to concentrating, persisting, or maintaining pace, for the period prior to April 28, 2018, the ALJ found he had the RFC to perform "simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements and involving only simple work-related decisions with few, if any workplace changes." Tr. at 27–28. These components of the RFC assessment generally addressed Plaintiff's abilities to initiate and perform a task he knew how to do, work at an appropriate and consistent pace, and change activities or work settings. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(E)(3).

In explaining the RFC assessment, the ALJ acknowledged Plaintiff had a long history of psychiatric symptoms, but found his allegations as to the intensity, persistence, and limiting effects of his symptoms were not entirely supported for the period prior to April 28, 2018. Tr. at 28–29. He stated the

overall record reflected Plaintiff's symptoms "were generally well controlled with medication and routine treatment prior to April 2018" and additional treatment records showed few significant objective abnormalities. Tr. at 29. He noted Plaintiff had received "intermittent mental health treatment through The Center for Counseling and Wellness" through June 2017, his "treatment records noted improvement in focus and mood with treatment," and "Dr. Menon often observed a euthymic mood." *Id.* He recognized "an exacerbation in the claimant's psychological symptoms in October 2017," but noted it "was brief and there was otherwise little additional treatment prior to May 2018." *Id.* He recounted Plaintiff's October 2017 treatment visit with NP Doud-Kearns during which he reported he had recently been arrested after "flipping out" and being thrown out of the shelter because he had been drinking. *Id.* He noted NP Doud-Kearns had noted Plaintiff's pressured speech, rambling thoughts, and poor focus and had discontinued Strattera, prescribed Elavil, and advised him to see a counselor. *Id.* He acknowledged Plaintiff subsequently established treatment with SW Linde on October 17, 2017. Tr. at 30. Although he cited SW Linde's observations of rapid speech and racing thoughts during the October 17 visit, the ALJ further noted Plaintiff's report to NP Doud-Kearns the following day that he was feeling "pretty well" and her unremarkable findings on exam. *Id.* He indicated Plaintiff had little additional treatment until May 2018. *Id.*

The ALJ discussed the medical opinions of record in explaining the RFC assessment. He found the state agency psychological consultants' opinions to be "generally persuasive" because they were "supported by detailed discussions of the medical evidence" and were "generally consistent with the record as a whole," which showed "routine and conservative mental health treatment." Tr. at 31. Particularly relevant to the ALJ's consideration of Plaintiff's ability to stay on task, his finding that the state agency consultants' opinions were generally persuasive suggests his acceptance of Dr. Farish-Ferrer's conclusion that Plaintiff was "capable of performing simple tasks for at least two hour periods of time" and was able to "attend work regularly." Tr. at 176. The ALJ specifically rejected Dr. Farish-Ferrer's indication that Plaintiff would occasionally miss a day of work due to psychiatric symptoms as vague. *See* Tr. at 31. This suggests he largely accepted the individual abilities and restrictions Dr. Farish-Ferrer included in her opinion, except for the restriction as to missing work, in assessing Plaintiff's RFC.

The ALJ considered Dr. Spivey's opinion to be "generally persuasive," as it was "supported by a detailed examination report." Tr. at 32. However, he noted Dr. Spivey's findings were inconsistent with the other evidence to the extent that Plaintiff had demonstrated intact memory and intact or mildly impaired attention and concentration during other exams. *Id.* The ALJ

did not consider Mr. Gnau's opinion persuasive as to Plaintiff's limitations prior to April 2018 because Mr. Gnau did not begin seeing Plaintiff until January 2019. *Id.* He noted SW Linde had provided multiple letters, but had not opined as to Plaintiff's functional limitations. *Id.*

The ALJ cited evidence that supported greater restriction after April 28, 2018. *See* Tr. at 33–34. He concluded that after April 28, 2018, Plaintiff had the prior restrictions, but "would be off task for more than one hour during an eight-hour workday in addition to regular breaks." Tr. at 33. He noted NP Doud-Kearns's observation of worsening memory problems in May 2018. *Id.* He cited Plaintiff's complaints and Dr. Spivey's findings during the July 2018 consultative exam. *Id.* He discussed Plaintiff's treatment with Dr. O'Connor, acknowledging that he had "continued to experience recurring symptoms with medication and recent records reflect[ing] some worsening in [his] symptoms." Tr. at 34. He noted Plaintiff had received ongoing treatment for psychiatric symptoms from Waccamaw Mental Health Center since January 2019. *Id.* He stated he continued to consider the state agency consultants generally persuasive, but had considered additional evidence received at the hearing level, including Mr. Janczak's testimony and "medical records showing increasing reports of pain and difficulty focusing since May 2018" in finding greater limitations after April 28, 2018. *Id.* He considered

Mr. Gnau's statements generally persuasive for the period since he began treating Plaintiff. *Id.*

The ALJ's decision reflects his incorporation of restrictions in the RFC assessment to reflect the marked limitation he assessed in concentrating, persisting, or maintaining pace. In accordance with SSR 96-8p, the ALJ provided a narrative discussion describing how the evidence supported the restrictions he assessed for the period prior to April 28, 2018, and greater restrictions for the period thereafter. He cited specific medical facts and found persuasive medical opinions providing restrictions consistent with the RFC assessment. He specifically rejected additional restrictions to address Plaintiff's limitations in concentrating, persisting, or maintaining pace as inconsistent with the evidence prior to April 28, 2018. Given the foregoing, the undersigned concludes substantial evidence supports the ALJ's consideration of marked limitations in concentrating, persisting, or maintaining pace in assessing Plaintiff's RFC for the period prior to April 28, 2018.

### b.    Interacting With Others

Plaintiff further contends the ALJ should have assessed marked limitation in social interaction and did not explain how he accounted for moderate limitation in social interaction prior to April 28, 2018. [ECF No. 20 at 28–31].

47

The Commissioner claims the ALJ considered all the evidence as to social interaction, explained his assessment of moderate, as opposed to marked, limitation, and included a provision in the RFC assessment that reasonably accommodated Plaintiff's limitations. [ECF No. 22 at 13].

To evaluate a claimant's ability to interact with others, the ALJ must consider the claimant's "abilities to relate to and work with supervisors, co-workers, and the public." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(2). Examples of this area of functioning including: "cooperating with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." *Id.* Although these examples "illustrate the nature of this area of mental functioning," ALJs are not required to document consideration of all the examples. *Id.*

The ALJ explained Plaintiff had "a moderate limitation" in interacting with others "before the established onset date." Tr. at 27. A moderate limitation means the individual has fair ability to function independently, appropriately, and on a sustained basis in the area of interacting with others.

Although Plaintiff maintains the record supported marked—as opposed to moderate—limitations in this area, the ALJ noted evidence consistent with

Plaintiff's fair ability to function. He cited Plaintiff's reports of limited social interaction and problems getting along with others and examinations that showed abnormal mood and affect at times. *See* Tr. at 27 (citing B3E/5–7; B7E5–7; B4F/3; B3F/7, 16, 76; B22F/4).[7] However, he noted that during the July 2018 consultative exam, Plaintiff "reported working part time and . . . getting along well with others in the workplace (B4F/2)." *Id.* He stated Plaintiff was observed to be cooperative and compliant throughout the consultative examination (B4F/3)." *Id.* He indicated treatment records had "shown improvement in mood stability with psychiatric treatment and multiple examinations ha[d] shown euthymic mood (*see, e.g.*, B3F/1, 20; B14F/14; B20F/10)." *Id.* He noted Plaintiff had "reported having friends,

_____

[7] The pages the ALJ references in exhibit B3E, an adult function report, include Plaintiff's reports of no longer fishing or feeling like doing anything, attending church for one hour weekly, chatting with a friend at the shelter, being argumentative with others, being "hard to work with," having problems following directions, being divorced twice, getting along "terribl[y]" with authority figures, and being fired from jobs after getting into arguments with coworkers. Tr. at 478–80. The pages the ALJ references at B7E include Plaintiff's reports in another adult function report of no change since the prior report, no interest in going places and taking part in things because of mental symptoms, having constant problems getting along with authority figures, and staying "secluded to stay out of trouble." Tr. at 504–06. Exhibit B4F/3 referenced Plaintiff's reports to Dr. Spivey and Dr. Spivey's behavioral observations. *See* Tr. at 780. The ALJ's references in Exhibit B3F include Dr. Menon's observations of dysthymic mood during a treatment visit on October 19, 2016, his observations of dysthymic and anxious mood during a treatment visit on March 22, 2017, and  NP Doud-Kearns's observations of flat affect, interruptions, and worried and anxious conversation during a treatment visit on May 14, 2018. Tr. at 690, 699, 759. Exhibit B22F/4 contains an MSE from Dr. Van Horn's initial psychiatric medical assessment on April 9, 2019. Tr. at 958.

socializing with others, and being able to attend church and shop in stores (*see*, *e.g.*, B4F/3, B19F/7; B3E/4–5; B7E/4–5)." *Id.*

Plaintiff argues the ALJ picked and chose among the medical reports and cited evidence favorable to his position, while ignoring the other evidence, ECF No. 20 at 30, but the undersigned's review does not support Plaintiff's argument. The ALJ noted some evidence supporting more significant limitations in the area, but referenced evidence reflecting an overall record consistent with moderate limitations. *See* Tr. at 27.

Pertinent to Plaintiff's arguments as to interacting with others, for the period prior to April 28, 2018, the ALJ found he had the RFC for "occasional interaction with the public and coworkers," but no "tandem tasks." Tr. at 28. Thus, he specifically limited Plaintiff's interaction with coworkers and the public.

The ALJ considered the medical opinions of record in assessing moderate limitation in Plaintiff's ability to interact with others and in incorporating specific restrictions into the RFC assessment. He found generally persuasive the state agency consultants' opinions that Plaintiff was "expected to have difficulty working in close proximity or coordination with co-workers," "best suited for a job which does not require continuous interaction with the general public," "capable of single, repetitive tasks without special supervision," and able to "attend work regularly and accept

supervisory feedback." *See* Tr. 31; *see also* Tr. at 176. Plaintiff appears to argue Dr. Farish-Ferrer's opinion supported less-than-occasional interaction with coworkers, but Dr. Farish-Ferrer actually noted Plaintiff should not work in close proximity to or in coordination with coworkers, Tr. at 176. The ALJ accommodated this limitation with the restriction for no tandem work. *See* Tr. at 28. Dr. Farish-Ferrer further indicated Plaintiff should not have continuous interaction with the general public, Tr. at 176, but the ALJ restricted Plaintiff even further to only occasional interaction with the public and coworkers. *See id.* The ALJ also considered Dr. Spivey's opinion in limiting Plaintiff's interaction with others. *See* Tr. at 32.

The ALJ addressed the prior ALJ's September 2017 hearing decision, writing:

> This finding is given some weight as to the limitation to simple, repetitive tasks and to the limitations on interaction with coworkers and the public; however, the record does not support the limitation to occasional interaction with supervisors. For example, while Mr. Janczak testified that the claimant sometimes had difficulty getting along with coworkers, he did not report any problems interacting with the claimant as his supervisor (Hearing Testimony). Additionally, at a consultative examination in July 2018, the claimant reported getting along well with others in the workplace and the examiner noted that he was cooperative and compliant throughout the examination (B4F/2–3).

*Id.* Thus, the ALJ specifically rejected additional restriction in Plaintiff's ability to interact with supervisors.

Given the foregoing, the ALJ adequately explained his consideration of Plaintiff's limitations in interacting with others, and substantial evidence supports the restrictions he included in the RFC assessment.

### 2.    Dr. Spivey's Opinion

Plaintiff argues that, despite having found Dr. Spivey's opinion to be generally persuasive, the ALJ failed to accept some portions of the opinion and incorporate them in the RFC assessment. [ECF No. 20 at 36]. He maintains the preclusion from fast-paced work did not account for Dr. Spivey's indication that he would have problems with stamina and persistence in any work environment. *Id.* He contends the ALJ did not include restrictions as to interaction with supervisors, despite Dr. Spivey's indication he would have difficulty relating well to others due to mood swings. *Id.* at 35, 36. He claims to the extent the ALJ rejected Dr. Spivey's opinion as to his ability to get along with supervisors based on Mr. Janczak's testimony, he did so in error. *Id.* at 36.

The Commissioner argues the ALJ properly considered Dr. Spivey's opinion. [ECF No. 22 at 13–14]. He points out that Dr. Spivey rendered his opinion in July 2018, three months after the date the ALJ found Plaintiff became disabled.

For claims filed after March 27, 2017, the applicable regulations require ALJs to consider the persuasiveness of each medical opinion of

record, given the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1520c(b), (c), 416.920c(b), (c). Supportability and consistency are considered more important than the other factors, and the ALJ must explicitly note how he considered them in evaluating each medical opinion. 20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2). In evaluating the supportability factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion . . . the more persuasive the medical opinion will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "The more consistent a medical opinion . . . is with the evidence from other medical sources and nonmedical source in the claim, the more persuasive the medical opinion . . . will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

The ALJ considered Dr. Spivey's opinion to be generally persuasive. Tr. at 32. He considered the supportability factor, noting the opinion was "supported by a detailed examination report." *Id.* Despite having found the opinion "generally persuasive," he reflected in evaluating the consistency factor that it was "not entirely consistent with other examinations, which have shown intact memory and intact or mildly impaired attention and concentration (*see*, *e.g.*, B19F/8; B22F/4; B23F/3)." *Id.*

The ALJ's RFC assessment is consistent with his finding Dr. Spivey's opinion generally persuasive. The restrictions in the RFC assessment to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements and involving only simple, work-related decisions with few, if any, workplace changes were consistent with Dr. Spivey's opinion that Plaintiff was capable of understanding simple instructions and performing simple tasks and would have difficulty understanding complex instructions and performing complex tasks. *See* Tr. at 781. The restrictions for occasional interaction with the public and coworkers and no tandem tasks considered Dr. Spivey's opinion that Plaintiff "would display difficulty relating well to others in the workplace due to his report of bipolar related mood swings," as well as his report that he was "currently getting along well with others while working through the temporary agency." *See id.*

Although Plaintiff argues the ALJ erred in declining to include additional limitations in the RFC assessment to address all the restrictions Dr. Spivey found, the ALJ provided a sufficient explanation for the restrictions he included and excluded that does not undermine his finding that Dr. Spivey's opinion was generally persuasive. As the Commissioner notes, Dr. Spivey rendered his opinion in July 2018, several months after the date the ALJ determined Plaintiff became disabled. *See* Tr. at 779–81. The ALJ specified that "additional evidence received at the hearing level,

including the testimony of Mr. Janczak describing the claimant's difficulties completing tasks and working with others as well as the medical record showing increased reports of pain and difficulty focusing since May 2018, support[ed] further limitations. *See* Tr. at 34. Thus, the ALJ reasonably declined to include additional restrictions in Plaintiff's RFC for the period prior to the established onset date and Dr. Spivey's opinion because the earlier evidence showed fewer limitations.

While Plaintiff argues the ALJ erred in inferring that Plaintiff would have no problems getting along with supervisors because of his ability to get along with Mr. Janczak, this was only one piece of information the ALJ relied on in assessing Plaintiff's ability to interact with supervisors. The ALJ specifically found that additional restriction as to Plaintiff's interaction with supervisors was not warranted, given Mr. Janczak's testimony as to his interaction with Plaintiff, Plaintiff's ability to cooperate with Dr. Spivey, and his reports to Dr. Spivey. *See* Tr. at 32.

The ALJ declined to include additional restrictions as to Plaintiff's cognitive functioning, noting other examinations showed "intact memory and intact or mildly impaired attention and concentration (see, e.g., B19F/8; B22F/4; B23F/3)." *Id.* Earlier in the decision, the ALJ cited Plaintiff's providers recording of intact memory and his ability to perform personal care and activities of daily living. *See* Tr. at 26.

Substantial evidence supports the ALJ's consideration of Dr. Spivey's opinion, given his finding that the opinion was generally—as opposed to fully—persuasive; his consideration of the supportability and consistency factors; his reasons for including some and excluding other limitations; and the fact that Dr. Spivey's opinion was rendered after the established onset date.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

*Shiva V. Hodges*

June 8, 2021                                    Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge